[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs in this action are property owners and residents of the Borough of Naugatuck who bring this action seeking a mandamus ordering the Borough or its flood and erosion control board to apply to the state department of environmental protection for funds to investigate the appearance of holes in the plaintiffs' yards. The Borough has failed to seek such funds and disputes the plaintiffs' right to a mandamus.
Many of the material facts giving rise to the plaintiffs' claim are not in dispute. The plaintiffs are the owners of three lots in a subdivision known as Indian Hill, located on Morning Dove Road and Bob White Circle in the Borough. The plaintiffs reside in homes on these properties which were built approximately twenty years ago. Beginning in May, 1992, first small holes and then larger sinkholes opened in the yards of the plaintiffs as well as the yards of several neighbors. Some of the holes were as much as ten feet deep and many contained groundwater. The plaintiffs attempted at first to fill the holes, but additional holes opened and some of the filled holes reopened. The plaintiffs then sought assistance from governmental officials at the local, state and federal level. From discussions with these officials the plaintiffs learned of the alleged availability of funds from the state department of environmental protection ("DEP") to investigate the cause of the sinkholes.
The governing authority of the Borough is its Board of Mayor and Burgesses (the "Board"). By ordinance, the Board acts as the flood and erosion control board for the Borough. At its regular meeting on September 7, 1993, the Board went into executive session to "discuss . . . the problems at the Indian Hills Sub-Division . . ." with the Board's attorney. The Board took no further action with respect to the plaintiffs' request to seek funds from the DEP. This action was brought in October, 1993.
On October 13, 1993 the court (McDonald, J.) entered a CT Page 11483 temporary injunction ordering the Borough to "take immediate steps to safeguard the children with regard to the sinkholes." In December, 1993, employees of the Borough excavated the Evan and Quinn yards in an effort to comply with the temporary injunction. Digging to a depth of approximately six feet, Borough employees found large boulders, branches, timbers, stumps, wood and shotrock (ledge or boulders which have been broken up by dynamite). The large boulders, branches, stumps and shotrock, all considered unsuitable fill material, were removed and replaced with bank run gravel. The Borough then compacted the new fill and restored the yards.
After this excavation and refilling by the Borough, plaintiffs Evan and Quinn continued to experience sinkholes opening up in their yards. Photographs of these holes demonstrate, however, that the new holes are considerably smaller in width and fewer in number. Three lots in the subdivision in addition to the plaintiffs' three lots have also developed sinkholes.
The plaintiffs are people of modest means who lack the financial resources necessary to pay for an investigation of the cause of the sinkholes. (The Borough's work at the Evan and Quinn properties cost the Borough approximately $10,000.) Therefore, the plaintiffs have looked to the Borough to seek funding from the DEP to investigate the cause of the sinkholes.
The threshold issue in this case is whether the plaintiffs have established the necessary requisites for the issuance of mandamus. The only relief which the plaintiffs seek from the court is an order of mandamus. Mandamus is used to compel the performance of a ministerial act by a public officer when the petitioner has a clear legal right to the immediate performance of that act. Beccia v. City of Waterbury, 185 Conn. 445, 453-54
(1981). A writ of mandamus is an extraordinary remedy. Hackettv. New Britain, 2 Conn. App. 225, 227 (1984); McAllister v.Nichols, 193 Conn. 168, 171 (1984). Mandamus is available only if (1) the party applying for the writ has a clear legal right to have the duty performed, (2) the defendant has no discretion with respect to performance of that duty; and (3) the plaintiff has no adequate remedy at law. Par Developers v. Planning Zoning Commission, 37 Conn. App. 348, 352 (1995); Golab v. NewBritain, 205 Conn. 17, 20 (1987). The plaintiffs have failed to establish first, that they have a clear legal right to have the Board, in its capacity as Naugatuck's flood and erosion control CT Page 11484 board, seek funding from the DEP and secondly, that the Board has no discretion with respect to seeking such funds.
The plaintiffs' request for mandamus is premised on the contention that the sinkholes have been caused by an underground stream. In the application for mandamus, the plaintiffs allege,
 [T]he plaintiffs understand that said erosion and sinkholes are caused by the flow of an underground stream that had been diverted or otherwise blocked at the time of the construction of their homes. Said stream has apparently regained its channel by means presently undiscovered . . . Said watercourse is apparently entering upon the plaintiffs property from lands under public streets and exits their property onto other private lands and or public storm sewer systems, thus the apparent effects of this erosion are most likely to extend to both public and other private lands if not promptly controlled.
These allegations were not sustained by the evidence produced at trial.
The only expert testimony admitted at trial with respect to the cause of the sinkholes was that of Robert Jones, a geologist and engineer. Jones testified that the sinkholes were caused by unsuitable material which was buried by the subdivision developer. Jones testified that using large boulders and shotrock as fill precludes compacting the soil, which leads to soil subsidence and voids in the soil. He also testified that the use of wood, such as logs and tree stumps, for fill is improper because voids will be caused in the subsurface when the wood rots and decays. The voids and subsidence lead to the creation of sinkholes. The Borough's excavation and replacement of much of the unsuitable fill at the Evan and Quinn properties was a proper solution to the problem, Jones testified. Jones' testimony was persuasive and credible and was not disputed by any other witness.
The only admitted evidence which arguably supported the plaintiffs' claim of an underground stream was the testimony of Robert Cole, a registered land surveyor who prepared the 1975 subdivision survey for the Indian Hill Subdivision. He testified that the lots which later came to be owned by the Evans and the Quinns were "swampy" as noted by the use of the CT Page 11485 terms "wet area" and "edge of wet" on the map. These lots had to be filled. Cole further testified that there was no indication that the wet area was a pond or a lake, that it was not necessarily a wetland and that a stream was possible, but its contours were not defined. Cole also testified that he is not an engineer and has no expertise concerning soil conditions. He did not testify as to any connection between the wetness of the lots and the sinkholes. His testimony, therefore, did not sustain the plaintiffs' allegations.
The court finds that the sinkholes were caused by the use of improper fill material, not by an underground stream which "regained its channel" as plaintiffs allege. The significance of this finding is that it calls into question whether the DEP would provide funding to investigate the sinkholes given that they result from the developer's negligence or misfeasance rather than an underground watercourse. The plaintiff's premise, that the sinkholes were caused by an underground stream, was not sustained at trial.
The Borough's flood and erosion control board was established pursuant to General Statutes § 25-84 et seq. These statutes are found in Part II of Chapter 477 of the General Statutes, which is entitled "Flood Control and Beach Erosion." Part I of the chapter is entitled "State Assistance". In General Statutes § 25-69, state policy with respect to flood control and erosion is set forth:
 It is hereby found and declared that, because of the occurrence of severe storms accompanied by winds up to hurricane force, abnormal high tides and tide flooding, the lives and property of residents and other persons within areas exposed to such hazards are endangered, . . . it is further found and declared to be in the public interest to secure such exposed areas by the most economical and effective means for safeguarding life and protecting property and, because it is uneconomical and ineffective for the general purpose for an individual landowner to attempt to maintain protective installations separated from and lacking coextension with those of abutting properties, that it is in the public interest to provide the ways and means for collective and cooperative action to alleviate the dangers and destruction common to such exposed areas.
CT Page 11486
(Emphasis added.) "Exposed areas" is defined in the next statutory section, § 25-70:
 Land areas fronting on the ocean, or on bays, inlets and coves, or bordering on rivers in which tides occur, that are subject to the full force of storms; or land areas in direct contact with storm waves, including banks, bluffs, cliffs, promontories and headlands or similar topographical or geological formations, that are subject to erosion through wave action; or open beach areas, including spits, dunes and barrier beaches, that are subject to loss of sand through high waves, strong currents or scouring wave action; or land areas subject to inundation during storms or vulnerable to storm damage because of geographical situation, may be classed as exposed areas within the meaning of sections 25-69 to 25-75, inclusive.
A reading of these two statutory sections shows that the concern of the legislature in adopting these sections relating to state assistance for flood control and erosion was with land areas which border some type of waterway or which become inundated as a result of storms. It is questionable whether state assistance under these statutes is available for assistance for the plaintiffs, whose problem arises out of negligence or misfeasance by the subdivision developer.
The party which seeks a mandamus has the burden of proving that it is being deprived of "a clear legal right". Light v.Board of Education, 170 Conn. 35, 38 (1975). The plaintiffs here, who seek an order of mandamus ordering the Board to apply to DEP for funds to investigate the sinkholes, necessarily have the burden of proving that such funds are indeed available to investigate the sinkholes despite the fact that the holes were not caused by flooding, storm damage or an underground stream. Because the plaintiffs failed to present this necessary evidence, mandamus cannot issue.
Moreover, even if plaintiffs had established the availability of such funds to address the sinkholes, the plaintiffs must further establish that the Board has a clear legal obligation to apply for and accept such funds. Mandamus will not lie to require performance of an act which requires the CT Page 11487 exercise of discretion or judgment by a public official. Id.
Therefore, if the Board has the discretion to decide whether or not to seek funds from DEP, mandamus cannot issue.
General Statutes § 25-84 provides that a municipality "may, by vote of its legislative body, adopt the provisions of this section and sections 25-85 to 25-94, inclusive, and exercise through a flood and erosion control board the powers granted thereunder." General Statutes § 25-85 provides, in part,
 Such board shall have authority, within the limits of appropriations from time to time made by the municipality, to plan, lay out acquire, construct, reconstruct, repair, maintain, supervise and manage a flood or erosion control system.
The next statutory section, § 25-86, gives the board the right to take property:
 Such board is authorized to enter upon and to take and hold, by purchase, condemnation or otherwise, any real property or interest therein which it determines is necessary for use in connection with the flood or erosion control system.
In General Statutes § 25-87, the board is given the authority to issue bonds, use tax revenues or make special assessments to defray the cost of a flood or erosion control system.
General Statutes § 25-94 provides that the board "is authorized to negotiate, cooperate and enter into agreements with . . . the state of Connecticut . . . for the improvement of navigation . . . and for protection of property against damage by floods or by erosion . . ." The concluding provision of this part of Chapter 477 of the statutes, § 25-98, provides:
 In carrying out the purposes for which it was established, any local authority authorized to contract under section 25-94 may accept, receive and expend gifts, devises or bequests of money, lands or other properties to be applied and expended in the manner provided herein.
Under this last provision, the Board presumably has the authority to accept funds from DEP as "gifts," but the statute, CT Page 11488 which uses the word "may" rather than "shall," does not require the Board to do so. A general rule of statutory construction provides that the word "shall" connotes a mandatory duty while the word "may" implies permissive action. Brown v. Smarrelli,29 Conn. App. 660, 663 (1992).
Clearly, the Board is not required by the terms of its governing statutes to seek and accept DEP funds. Likewise, there is no case law which supports such a contention. The Board has the discretion, but not the mandatory duty to seek funds from the DEP. In his post-trial memorandum, counsel for the plaintiffs has cobbled together snatches of cases from different jurisdictions in an unsuccessful attempt to construct a claim that the Board has a mandatory duty to seek funds from the DEP to investigate the sinkholes.
First, the plaintiffs contend that the Board's duty to seek DEP funds is mandatory because the Board knows of the plaintiffs' peril. 2 Restatement (Second), Torts § 324 (1965) imposes liability on a person who, although having no duty to do so, "takes charge of another who is helpless" and then fails to exercise reasonable care. However, the plaintiffs have not shown that § 324 has been adopted by our Connecticut courts. Moreover, the Borough has never "taken charge of" the plaintiffs; the work done by the Borough at the Evans and Quinn properties was done in compliance with a temporary injunction, not as a voluntary action. Furthermore, there is nothing in the comments to § 324 which demonstrates that it was intended to apply to municipalities. Neither Farwell v. Keaton, 396 Mich. 281,240 N.W.2d 217 (1976) nor Soldano v. O'Daniels, 141 Cal.App.3d 443,190 Cal.Rptr. 310 (1983), relied on by the plaintiffs, is of any precedential value in the case before the court. Both were wrongful death actions arising out of a factual context wholly unlike the one which is before the court.
The plaintiffs' second argument is somewhat elusive. Counsel for the plaintiffs begins by citing General Statutes § 52-557n(b)(7), which protects a municipality from liability for damages resulting from certain events unless the municipality's inaction "constitutes a reckless disregard for health or safety". He then cites two cases, Wright v. Brown, 162 Conn. 464,471-2 (1975) and Shore v. Stonington, 187 Conn. 147, 156
(1982). In both of these cases a municipality or its officials was sued for money damages. Neither the statute nor these cases address mandamus or the mandatory or discretionary aspect of CT Page 11489 municipal action. Therefore, the claim is without merit.
Counsel for the plaintiffs next argues that although the Borough was not required to form a flood and erosion control board, once it did so, "the municipality must perform according to the provisions of the statutes or ordinances that control.Trivalent Realty Co. Inc. v. Westport, 194 Conn. 807 (1984)." The Trivalent Realty case concerns a real estate tax assessment appeal where the defendant town did not comply with General Statutes § 8-24; the ruling has no applicability to the issues before this court.
In his concluding argument, counsel for the plaintiffs argues that the duties of the Board as set forth in General Statutes § 25-85 are mandatory because of the use of the he word "shall". This claim ignores the actual wording of the statute, which gives the Board the authority to construct and maintain a flood or erosion control system, but does not require it to do so. "Such board shall have authority within the limits of appropriations . . . to plan, lay out, acquire . . ." (Emphasis added.) There is no merit to this argument.
The plaintiffs have failed to show that the Board has a mandatory duty to seek funds from the DEP for purposes of investigation of the sinkholes at the plaintiffs' properties. Without such a showing, mandamus may not issue. Judgment is entered for the defendants.
VERTEFEUILLE, J.